IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LISA J. SANTER             :
                               :
                 Plaintiff    :   CIVIL ACTION
                               :
       vs.               :
                               :   NO.  06-CV-1863
                               :
TEACHERS INSURANCE AND    :
ANNUITY ASSOCIATION, ET AL.  :
                               :
          Defendants   :

**MEMORANDUM OPINION & ORDER**

GOLDEN, J.                                     MARCH 18, 2008

Before the Court is the plaintiff's motion to compel production of documents.  The Court

will grant the motion in part and deny it in part for the reasons that follow.

**BACKGROUND**

The following is taken from the Complaint.  The University of Alabama Birmingham

("UAB")  hired plaintiff as an Assistant Professor of Pediatrics in September 1992.  In December

1993 or January 1994, plaintiff developed "severe and violent vertigo and nausea, which was

subsequently diagnosed as an unspecified peripheral vestibular dysfunction – a dysfunction of the

inner ear."  Compl. at ¶ 23.  This condition compelled plaintiff to cease working at the end of

January 1994.

At the time plaintiff left work, Teachers Insurance and Annuity Association ("TIAA")

administered UAB's disability benefits.  TIAA approved payment of disability benefits to

plaintiff in April 1994, and they continued until May 2005.[1]  TIAA sold the rights to administer

---

[1] The Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1000, *et seq.*, does not govern
this dispute because UAB is an agency and/or instrumentality of the State of Alabama and plaintiff's insurance
policy is therefore a "governmental plan" exempt from ERISA pursuant to 29 U.S.C. §§ 1002(32) and 1003(b)(1).

its disability claims to Standard Benefit Administrators ("Standard") in October 2002, and

Standard began administering plaintiff's benefits in March 2003.  In and around this time period,

Standard arranged for plaintiff to undergo an independent medical examination and a functional

capacity evaluation.  Standard also conducted surveillance on plaintiff, and identified several

organizations for which it appeared plaintiff performed volunteer work, including acting as

director of the Philadelphia chapter of the National Coalition Building Institute, co-founding the

Jewish Dialogues Group, and planning and participating in various other volunteer and non-

profit organization events.  Plaintiff submitted extensive documentation supporting her claim of

disability, including letters and evaluations from her treating physicians and assurances from

members of the groups for which plaintiff volunteered that plaintiff's participation in volunteer

activities was subject to the limits of her disability.

Based upon the results of plaintiff's functional capacity evaluation, her independent

medical examination, review of surveillance footage, and her participation in the volunteer

organizations, Standard terminated plaintiff's disability benefits in June 2005.  Plaintiff initiated

this lawsuit in May 2006.  In July 2006, defendants reinstated plaintiff's benefits and provided

her with back pay for the period of her termination.  See Pl.'s Supp. Memo. of Law in Support of

Mtn. to Compel (Docket Document No. 28-11) (hereinafter "Pl.'s Supp. Memo.").  Plaintiff

seeks damages for breach of contract, breach of the covenant of fair dealing, and bad faith

pursuant to 42 Pa. Cons. Stat. Ann. § 8371.

## PROCEDURAL HISTORY

Plaintiff filed a motion to compel production of documents in three categories:  (1)

documents relating to TIAA and Standard's pre- and post-transaction evaluations of the disability

claims business block TIAA sold to Standard; (2) documents relating to Standard's performance evaluations of the units and individuals handling plaintiff's claim; and (3) claims denial letters from the third party vendors who performed plaintiff's independent medical examination and functional capacity evaluation on Standard's behalf.  To date, defendants have provided plaintiff with documents including her claims file; several hundred reports of Richard Handelsman, M.D., the physician who reviewed plaintiff's file and recommended terminating her benefits; the TIAA claims manual; documents relating to third party vendor Ergoscience; other employee training materials; and documents related to employee evaluations.  After reviewing plaintiff's motion and defendants' opposition thereto, the Court conducted oral argument via the telephone, including discussion of Saldi v. Paul Revere Life Ins. Co., 224 F.R.D. 169 (E.D. Pa. 2004), which allowed the type of discovery plaintiff seeks.[2]  The Saldi decision relied in part on the claimant's provision of documents relating to Paul Revere Life Insurance obtained in other litigation suggesting that further discovery would lead to documents supporting the bad faith allegations in that case.  Id. at 173.  The plaintiff in the case *sub judice* had not made a similar preliminary showing, and the Court ordered plaintiff to submit documents obtained thus far that suggest defendants engaged in bad faith practices.  Counsel obliged the Court with prodigious submissions; plaintiff filed a 45-page brief accompanied by 26 exhibits, and defendants countered with a 39-page response.  Having reviewed the filings, the Court is now confident that it has an adequate foundation on which to rule.

### APPLICABLE LAW

Pennsylvania's bad faith insurance practices statute provides that in "an action arising

---

[2] The Court notes that plaintiff's counsel in Saldi is also plaintiff's counsel in this matter.

under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured," it may "(1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3% . . . (2) Award punitive damages;" and "(3) Assess court costs and attorney fees against the insurer."  42 Pa. Cons. Stat. Ann. § 8371.  In order to succeed on a bad faith claim, plaintiff must demonstrate "(1) that the insurer did not have a reasonable basis for denying benefits under the policy; and (2) that the insurer knew of or recklessly disregarded its lack of a reasonable basis in denying the claim."  Northwestern Mut. Life Ins. Co. v. Babayan, 430 F.3d 121, 137 (3d Cir. 2005).  Knowledge or reckless indifference is crucial because "[m]ere negligence on the part of the insurer is insufficient to sustain a bad faith claim."  Williams v. Hartford Cas. Ins. Co., 83 F. Supp. 2d 567, 571 (E.D. Pa. 2000) (citing  Poselli v. Nationwide Mut. Fire Ins. Co., 126 F.3d 524, 529 (3d Cir. 1994)).  "The insured is required to meet its burden of proving 'bad faith' by clear and convincing evidence."  Babayan, 430 F.3d at 137 (citing Terletsky v. Prudential Prop. and Cas. Ins. Co., 649 A.2d 680, 688 (Pa. Super. Ct. 1994)).

All discovery is subject to the strictures of Rule 26, which provides that discoverable information must be "relevant to any party's claims or defense."  Fed. R. Civ. P. 26(b)(1).  Not all relevant information is discoverable, however, as Rule 26 also directs courts to weigh the burden or expense of the sought discovery against the likely benefit of the required materials. Fed. R. Civ. P. 26(b)(2).  Rule 26 reflects, inter alia, the principle that "discovery is not intended as a fishing expedition permitting the speculative pleading of a case first and then pursuing discovery to support it."  Zuk v. E. Pa. Psychiatric Inst., 103 F.3d 294, 299 (3d Cir. 1996).

Defining the scope of discovery in bad faith insurance litigation often requires a court to

4

resolve disputes arising out of requests targeting broader corporate practices, as opposed to discovery seeking materials related to the handling of the individual plaintiff's claim.  This court has typically dealt with such disputes by allowing "pattern and practice" requests only "when a bad faith policy or practice of an insurance company is applied to the specific plaintiff."  Saldi v. Paul Revere Life Ins. Co., 224 F.R.D. 169, 176 (E.D. Pa. 2004); see also Fid. and Deposit Co. of Md. v. McCulloch, 168 F.R.D. 516, 526 (E.D. Pa. 1996) ("Allowing discovery of other actions which concerned completely different facts and circumstances would 'run counter to the important but often neglected Rule 1 of the Federal Rules of Civil Procedure.'") (internal citation omitted); Garvey v. Nat'l Grange Mut. Ins. Co., 167 F.R.D. 391, 396 (E.D. Pa. 1996) (declining to allow discovery of defendant insurance carrier's claims manuals because the "contents of these manuals do not pertain to whether the plaintiff's present claim for loss is 'covered' under the insurance contract"); N. River Ins. Co. v. Greater New York Mut. Ins. Co., 872 F. Supp. 1411, 1412 (E.D. Pa. 1995) (labeling discovery related to other bad faith actions "a fishing expedition"); Dombach v. Allstate Ins. Co., 1998 WL 695998, at *6-7 (E.D. Pa. Oct. 7, 1998) (finding plaintiff's proposed "broad discovery of other cases and nationwide practices and policies" to be "obviously overbroad").

Limiting discovery to the practices applied to the individual plaintiff is the preferable approach, as the "issue in a bad faith case is whether the insurer acted recklessly or with ill will towards the plaintiff in a particular case, not whether the defendants' business practices were generally reasonable."  Mann v. Unum Life Ins. Co. of Am., 2003 WL 22917545, at *10 (E.D. Pa. Nov. 25, 2003).  That is because "[w]hat constitutes a reasonable set of business practices for the investigation and evaluation of claims is a question properly left to the Pennsylvania

Insurance Commissioner, not a judge or a jury." Hyde Athletic Indus., Inc. v. Cont'l Cas. Co., 969 F. Supp. 289, 307 (E.D. Pa. 1997); see also Kosierowski v. Allstate Ins. Co., 51 F. Supp. 2d 583, 594 (E.D. Pa. 1999) ("The court agrees that the bad faith statute is not intended to be a means for individual plaintiffs to attack an entire insurance industry").  By limiting discovery to those practices employed in handling plaintiff's claim, the Court can ensure that the litigation remains focused on "the problems the bad faith statute intended to redress."  Id.

The Court now turns to the document requests at issue, mindful that in order for plaintiff to discover the documents she seeks, the information sought must: (1) be sufficiently relevant to outweigh the burden of its production; and (2) have been applied in the handling of plaintiff's insurance claim.  Before moving on, the Court must emphasize that it reviews these materials solely for the purpose of deciding the issues presented in this motion, and does not prejudge the outcome of any subsequent dispositive motions or trial.  The Court must evaluate plaintiff's showing, but only insofar as to answer the question of whether plaintiff has established a nexus between defendants' handling of her claim and the materials sought.  The Court need not and does not reach a conclusion concerning whether defendants acted in bad faith.

## ANALYSIS

### 1.      Transaction Evaluations

Plaintiff seeks documents relating to transaction evaluations TIAA and Standard performed before and after TIAA sold the rights to administer its disability claims to Standard. Plaintiff argues that such documents are relevant in a bad faith litigation because they might contain information indicating TIAA and Standard's state of mind regarding what they hoped to gain from the purchase and sale of the disability claims, and how they sought to accomplish those

goals.  Such information could be relevant to determining reprehensibility on TIAA and

Standard's part, which bears on the availability of punitive damages.  It might also show that a

particular act of bad faith is part of a larger fraudulent scheme or corporate policy.  State of mind

may be proven via corporate policies, e.g., Bonenberger v. Nationwide Mut. Ins. Co., 791 A.2d

378, 381-82 (Pa. Super. Ct. 2002), which is important because proving bad faith requires

showing that a defendant knew of, or recklessly disregarded its lack of, reasonable basis in

terminating a claim.  Babayan, 430 F.3d at 137.  Transaction evaluations may reveal post-

transaction trends in premiums-collection that could suggest that either Standard had a motive to

deny claims in bad faith, or TIAA had knowledge that Standard was denying claims in bad faith.

     In support of these requests and the legal arguments behind them, plaintiff provided the

Court with documents including corporate designee testimony indicating that Standard and TIAA

monitored personnel performance and distributed performance reports to its employees.  TIAA

and Standard also monitored the financial performance of the disability claims block of business

before and after TIAA sold administration rights to Standard. Plaintiff suggests that defendants'

distribution of performance reports fostered pressure to perform such that defendants' employees

were likely to engage in undue practices in order to improve their evaluations.

     Plaintiff also provided the evaluation of her claim by Nancy H. Nelson, M.D., a retired

obstetrician-gynecologist.  Plaintiff alleges the report contains evidence of bias because Dr.

Nelson's functional capacity evaluation failed to consider that plaintiff took an unusually long

time to complete her Ph.D. program.  Dr. Nelson also allegedly misrepresented the degree of

confidence Steven A. Telian, M.D., held in plaintiff's chances of recovery after he examined her

in March 1994.  See Pl.'s Supp. Memo. Ex. 7 (Docket Document No. 28-11).

Plaintiff offers her analysis of Dr. Nelson's review in support of her theory that TIAA targeted certain claims, such as plaintiff's, for improperly biased "reviews" during 2002 because it was seeking to complete the transfer of claims administration to Standard, and thus had a motive to close longstanding claims regardless of their merit.  Plaintiff points to documents concerning Standard disability claims analyst Madrisa Otero's review of her file as further evidence of this theory.  See Pl.'s Supp. Memo. Ex. 13 (Docket Document No. 28-17).  Seizing on the notation "RT," Pl.'s Supp. Memo. Ex. 14 (Docket Document No. 28-18), plaintiff argues that Ms. Otero held a "round table" where Standard employees brainstormed fraudulent reasons to terminate plaintiff's claim.  See Hangarter v. Provident Life and Acc. Ins. Co., 373 F.3d 998, 1011 (9th Cir. 2004) (explaining the use of "round tables" and other unethical claims termination practices).  Plaintiff further alleges that Standard's designation of her claim as part of a "Non-Specific Illness ICD9 Code Project," see Pl.'s Supp. Memo. Ex. 4 (Docket Document No. 28-8), suggests that defendants singled out her claim for termination.

Plaintiff's arguments leave the Court unpersuaded.  Plaintiff cannot have free reign to discover defendants' documents solely for the purpose of establishing corporate state of mind.  Saldi, 224 F.R.D. at 183 n.18 ("we will not permit the discovery of the records generally for the sole purpose of establishing evidence of Defendants' mental state.").  The Court does not mean to suggest that corporate state of mind evidence is never relevant, but such requests are overbroad in this context because plaintiff has failed to produce some hint that defendants applied the bad faith practices alleged in the handling of her case.  Id.

As a point of departure, the Court notes that the transaction in question closed in March 2003, whereas defendants terminated plaintiff's benefits in May 2005.  This fact alone renders

any connection between the transaction and the handling of plaintiff's claim tenuous.  Plaintiff

insists that the process leading to her benefits termination began with Dr. Nelson's review of her

file in 2002, when TIAA and Standard were negotiating the transfer of the disability claims

handling business, but a review of the history of plaintiff's claims file reveals that the status of

plaintiff's disability has been under periodic review since TIAA began providing plaintiff

benefits in 1994.  For example, plaintiff's physicians provided TIAA with status updates in April

1997, August 1997, May 1998, and May 2000.  Compl. at ¶ 27.  Viewed in this context, Dr.

Nelson's 2002 review of plaintiff's file is simply another in a series of ongoing reassessments of

plaintiff's disability.  Plaintiff has provided no evidence to the contrary beyond the coincidence

that Dr. Nelson's review happened to be contemporaneous with the business negotiations

between TIAA and Standard.

Moving to the contents of Dr. Nelson's review, the Court finds nothing suspicious in her

conduct.  For example, plaintiff claims that Dr. Nelson mischaracterized Dr. Telian's statements

regarding plaintiff's chances of improvement, but a comparison of the physicians' statements

reveals no such thing.  In 1994, Dr. Telian wrote that he "would suspect that there is an

approximate *80 percent chance of a complete or dramatic improvement*" in her condition, Pl.'s

Supp. Memo. Ex. 8 (emphasis supplied), and in 2002 Dr. Nelson wrote that Dr. Telian had

"outlined anticipation of an *80 percent chance of complete or dramatic improvement*."  Pl.'s

Supp. Memo. Ex. 7 (emphasis supplied).  The Court can discern no meaningful difference

between the original statement and Dr. Nelson's rephrasing.  Likewise, plaintiff criticizes Dr.

Nelson's failure to sufficiently credit the length of time it took plaintiff to complete her Ph.D. in

assessing the extent of plaintiff's disability.  While it may be true that Dr. Nelson could have

interpreted the time it took plaintiff to earn a Ph.D. in a different manner, the fact plaintiff

completed a Ph.D. program at all might indicate that plaintiff's condition had improved.

Moreover, an insurance company's review of a claims file need not conform to a perfect standard

in order to avoid liability for bad faith.  See, e.g., Mann v. Unum Life Ins. Co. of Am., 2003 WL

22917545, at *7 (E.D. Pa. Nov. 25, 2003) ("To defeat a bad faith claim, the insurance company

need not show that the process used to reach its conclusion was flawed or that its investigatory

methods eliminated possibilities at odds with its conclusion."); see also Krisa v. Equitable Life

Assur. Soc., 113 F. Supp. 2d 694, 704 (M.D. Pa. 2000) ("bad faith is not established if there is

any reasonable interpretation that supports a coverage determination favoring the insured.");

Cantor v. Equitable Life Assur. Soc'y of the United States, 1999 WL 219786, at *2 (E.D. Pa.

Apr. 12, 1999) (stating that an "insurance company is not required to demonstrate its

investigation yielded the correct conclusion or even that its conclusion more likely than not was

accurate").

     Plaintiff cites to another case criticizing Standard's claims handling process, but again

fails to connect the procedures criticized in that case to the handling of her claim.  See Cohen v.

Standard Ins. Co., 155 F. Supp. 2d 346 (E.D. Pa. 2001).  The criticized practice was the reliance

on a non-treating physician's cold review of a claimant's file in favor of the claimant's treating

physician, id. at 354, whereas here, the plaintiff was subject to multiple independent medical

examinations.  Compl. at ¶¶ 38 and 44.

     The additional materials that plaintiff cites can be dismissed as mischaracterizations of

innocent documents.  For example, plaintiff claims that the notation "RT" in a note referring to

her file indicates that defendants intended to conduct the type of "round table" reviews another

insurance company applied to a California claimant's case.  See Hangarter, 373 F.3d at 1011.

Even assuming that "RT" stands for "round table," the fact that the same phrase a different

company used in another case crops up in this case strikes the Court as extremely tangential

evidence of bad faith.  As to the ICD-9 code project, the document in question asks whether the

"ICD-9 code has been changed to reflect correct dx," where "dx" means diagnosis.  Pl.'s Supp.

Memo. Ex. 4 (Docket Document No. 28-8).  This suggests that TIAA was merely conducting a

periodic review of undiagnosed claims to determine whether it could assign a formal medical

diagnosis.  Because plaintiff suffered from an affliction for which "there is no 'dipstick'

laboratory test," Mitchell v. Eastman Kodak Co., 113 F.3d 433, 443 (3d Cir. 1997) (discussing

chronic fatigue syndrome) (internal citations omitted), it is not unusual that her file would be one

with a non-specific diagnosis.  There are thus more innocent explanations than plaintiff's twisted

readings of these documents, and the Court can find no reason to order the discovery of

defendants' transaction evaluations.

  **2.**  **Performance Evaluations**

  Plaintiff seeks documents relating to evaluations Standard performed of the units and

individuals handling her claim.  She also seeks emails to and from those individuals containing

certain words.  Plaintiff alleges that such requests are appropriate because evidence of improper

pressures to evaluate claims on reasons other than their merits is relevant in bad faith cases.  See,

e.g., Bonenberger, 791 A.2d at 381-82.  The materials produced thus far allegedly demonstrate

that defendants set ceilings on claims payments and tied employee bonuses to their ability to

enforce those limits.

  Before continuing, the Court observes that the request for personnel information

implicates the strong public policy against disclosure of such materials.  See, e.g., Adams v. Allstate Ins. Co., 189 F.R.D. 331, 333 (E.D. Pa. 1999) (finding requests for personnel files of employees who worked on plaintiff's claim "overbroad, and seek[ing] information that is unnecessarily invasive"); Stabilus v. Haynesworth, Baldwin, Johnson and Greaves, 144 F.R.D. 258, 266 (E.D. Pa. 1992) ("Defendant may not conduct general discovery into areas unrelated to its claims such as employee performance evaluations."); see also Carlucci v. Maryland Casualty Co., 2000 WL 298925, at *2 (E.D. Pa. Mar. 14, 2000) (referring to the "heightened relevancy standard when requesting the performance evaluations"); Cantor v. Equitable Life Assur. Soc'y of the United States, 1998 WL 306208, at *3 (E.D. Pa. June 9, 1998); Kaufman v. Nationwide Mut. Ins. Co., 1997 WL 703175, at *1 (E.D. Pa. 1997); Closterman v. Liberty Mut. Ins. Co., 1995 WL 472105, at *2 (E.D. Pa. Aug. 9, 1995).  Plaintiff will thus be held to a heightened standard in the context of these requests.

The "smoking gun" of plaintiff's conspiracy theory is the bonus retention worksheet Standard produced for its claims adjusters.  See Pl.'s Supp. Memo. Ex. 17 (Docket Document No. 28-21).  Plaintiff points to an evaluation category entitled "correct payment durations," under which the evaluator is directed to rate whether "90% of claims are resolved prior to occurrence of any-occ or policy limits."  Id.  Plaintiff argues that this document unequivocally proves the existence of a corporate program to reduce the average number of claims payments by awarding employees for resolving claims quickly.

The bonus sheet lends itself to multiple interpretations, however, and understanding the abbreviations on the form requires a brief explanation.  Defendants have stated that one way they categorize claims is whether the claimant is able to do their own occupation ("own-occ"), or

whether they can perform any occupation ("any-occ").  See Pl.'s Supp. Memo. at p. 31 n.42

(Docket Document No. 28).  Such a division is common in disability policies.  See, e.g., Das v.

Unum Ins. Life Co. of Am., 2005 WL 742444, at *11 (E.D. Pa. Mar. 31, 2005) (explaining the

difference between an own-occupation provision and an any-occupation provision and citing

other cases discussing the same).  The evaluation of whether 90% of claims are resolved prior to

the occurrence of "any-occ" may thus be read as a determination of whether a claims adjuster

resolved 90% of his or her claims before they shifted from own occupation benefits to any

occupation benefits under the terms of the relevant policies.

At his deposition, Standard's corporate designee, Richard B. Weisbaum, explained that

"resolving" claims means making a determination as to whether to continue providing benefits,

regardless of if the answer is yes or no.  Pl.'s Supp. Memo. Ex. 2 (Docket Document No. 28-6).

In other words, resolving a claim is not the same thing as terminating it.  Weisbaum also testified

that the "policy limits" language on the bonus form was a reference to limitation periods

contained in certain Standard policies.  Id.  For example, certain time intervals in mental disorder

policies require claims adjusters to ascertain whether something other than the mental disorder is

causing or contributing to the disability, and other policies provide that at some point a claimant

may become too old to continue coverage (e.g., "age out").  Id.

Turning to the "policy limits" reference on the bonus sheet, while it is true that one usage

of the phrase "policy limits" is to refer to the maximum payment the policy allows, given that, on

the bonus form, "policy limits" is used in the same sentence as "any-occ," the better reading of

the phrase "occurrence of any-occ or policy limits" in this context is that it refers to limitations

contained in the policies that signify the time by which certain events must occur.  That is

because, as used on the form, "any-occ" is a reference to a policy limitation, and use of "policy limit" in the same sentence suggests it references a limitation of a similar type. The corporate designee testimony supports this reading, see id., and plaintiff has not offered any convincing evidence to the contrary.

With this understanding in place, Standard's bonus form appears far more innocent than plaintiff suggests. The language in question is most likely intended to direct evaluators to rate claims adjusters on their ability to make decisions about whether or not to continue claims before certain common endpoints built into Standard's insurance policies, such as the transition from own occupation to any occupation disability, or the contributing factor limits in a mental disorder policy. There is nothing beyond plaintiff's sinister characterization of the form to suggest that Standard rewarded its employees for closing 90% of their claims before they reached a certain predefined point. Furthermore, none of the limits relating to the 90% resolution criterion relate to the termination of plaintiff's claim. Plaintiff does not suffer from a mental disability, she did not "age out" of her policy, and she moved from any occupation to own occupation disability in 1996, Compl. at ¶ 26, some ten years before the filing of this action. There is thus no connection between any of the alleged misconduct and Standard's handling of her claim.

Plaintiff also cites the job description of a Standard "senior disability technical specialist" containing a heading entitled "qualitative information which measures this job or indicates work volume," which specifies that Standard has authorized $4,000,000 in annual claims payments. See Pl.'s Supp. Memo. Ex. 16 (Docket Document No. 28-20). Plaintiff argues that this document demonstrates that defendants placed a $4,000,000 cap on claims payments irrespective of the claim's merit. Defendants' corporate designee explained that the job description with the

allegedly improper $4,000,000 payment authorization is not a limit on the amount Standard will pay for a claim, but rather a measure of the volume of claims an adjuster is handling.  Pl.'s Supp. Memo. Ex. 2 (Docket Document No. 28-6).  It is not improper, or even surprising, that an insurance company would track the volume of work its employees are performing, and using objective qualitative measurements like aggregate claims payments is a reasonable way of doing so.

Finally, plaintiff points to the bonus evaluation form for "Disability Benefits Supervisors."  See Pl.'s Supp. Memo. Ex. 19 (Docket Document No. 28-23).  This form directs evaluators to rate an employee's ability to perform "outcome-oriented disability management" through "actions taken to drive claims to outcomes" and "appropriate containment of the company's liabilities . . . through disability management strategies and techniques."  Id.  Plaintiff argues that Standard's juxtaposition of these criteria with the "pay for performance" philosophy outlined in a later section of the bonus form indicates a corporate philosophy of placing profits above its duties to its insureds.

Defendants counter with the same deposition testimony highlighted in response to plaintiff's attacks on the other bonus worksheets.  Namely, Mr. Weisbaum's repeated explanations that the bonus forms in question ask evaluators to rate an employee's ability to manage claims in a manner that ensures that resources are not wasted and legitimate policy provisions, such as "age out" stipulations, are enforced.  See Pl.'s Supp. Memo. Ex. 2 (Docket Document No. 28-6).  Moreover, defendants are not "bound to submerge [their] own interest in order that the insured's interests may be made paramount."  Cowden v. Aetna Cas. and Sur. Co., 134 A.2d 223, 228 (Pa. 1957).  Like the bonus forms for the other Standard employees, once Mr.

15

Weisbaum placed the contents of the form in context, they lose the villainous implications that plaintiff would ascribe to them.  Plaintiff therefore cannot connect any of the practices the form allegedly implies to the handling of her claim.[3]

The Court has considered tailoring a production order to require only the personnel files related to Ms. Otero and the other employees who actually reviewed plaintiff's claim.  But such production would run afoul of the principles of bad faith discovery set forth *supra*, as it is likely that a personnel file would contain a great deal of information related to the handling of claims of other insureds.  Moreover, the heightened standard to be applied in the context of personnel records counsels in favor of non-disclosure.  Finally, plaintiff has failed to connect any of the bad faith practices complained of to her document requests.  Given the foregoing, the Court believes it unwise to order even the limited disclosure of the personnel files of those few employees who reviewed plaintiff's file.

Plaintiff has also requested defendants produce all emails to and from employees handling her claim containing the words:  "recoveries," "reopens," "return to work," "rtw," "projections," or "resolutions."  Because there are so many innocent uses for such words, they do not suggest bad faith in and of themselves.  Likewise, plaintiff does not explain how emails containing these words might relate to the handling of her claim.  The Court is thus left to assume that the only purpose for this request is the hope that it might uncover some heretofore unknown corporate misconduct.  The Court will not permit this type of blind document grab.

---

[3] Plaintiff also seeks documents related to the "MONEY Bonus Program," which previously produced documents apparently reference.  Defendants respond, and plaintiff does not dispute, that none of the employees who handled plaintiff's claim took part in the MONEY Bonus Program, and any material related thereto is irrelevant. The Court will thus decline to order the production of such materials.

Despite plaintiff's efforts to characterize defendants' documents as indicative of a broader scheme to subvert a claim's merits to the pursuit of corporate profits, the Court finds no evidence of such a conspiracy.  Even had plaintiff been able to raise the specter of improper claims handling, further discovery into personnel evaluations is still unwarranted because plaintiff has been unable to establish a nexus between the practices alleged and the handling of her claim.  In the absence of this critical link, the Court cannot allow the additional discovery plaintiff seeks.

3.      **Claims Denial Letters**

Plaintiff seeks claims denial letters based upon claims file reviews of Richard Handelsman, M.D., and claims denial letters and functional capacity evaluations relating to reviews third party vendor Ergoscience performed for Standard.[4]  In order to support these requests, plaintiff asserts that the use of biased experts, improper use of experts, or the use of inappropriate evaluative criteria, can support a claim for bad faith and punitive damages.  Finally, plaintiff suggests that the materials she seeks may demonstrate that defendants were asking Dr. Handelsman and Ergoscience to review claimants suffering from maladies outside their respective areas of expertise.

Defendants have produced several hundred of Dr. Handelsman's reports regarding independent medical examinations he conducted for Standard.  Plaintiff asserts that this production is insufficient, however, because she needs the denial letters referencing such reports in order to determine whether and the extent to which Standard relied on Dr. Handelsman's reports in terminating benefits.

The documents produced to date indicate that Dr. Handelsman is an internist by training,

_____

[4] Plaintiff has agreed to the redaction of all confidential patient information contained in such materials.

but that Standard has asked him to review files of claimants with Lyme disease, fibromyalgia, chronic fatigue syndrome, Alzheimer's disease, depression, and Sjogren's syndrome.  Plaintiff claims that Dr. Handelsman's review of the files of claimants suffering from diseases outside his speciality is evidence that defendants engaged Dr. Handelsman to provide specious reasons to terminate otherwise valid claims, the inference being that if defendants were sincerely interested in an accurate evaluation of a claimant's condition, they would have used appropriate specialists.

As to Ergoscience, plaintiff points out that in May 2006, Standard was informed that Ergoscience's functional capacity methodology had not been specifically validated for patients with vestibular dysfunctions, such as plaintiff.  See Pl.'s Supp. Memo. Ex. 25 (Docket Document No. 28-29).  Plaintiff believes that further discovery might demonstrate that defendants relied on Ergoscience evaluations in terminating other vestibular disability claims, and perhaps relied on Ergoscience in terminating other claims for which Ergoscience's evaluating methodology had not been validated.

Defendants counter that information relating to other insureds is not relevant to whether defendants denied plaintiff's claim in bad faith.  See, e.g., Fid. and Deposit Co. of Md. v. McCulloch, 168 F.R.D. 516, 525 (E.D. Pa. 1996).  Defendants also argue that if they were requried to disclose the denial letters of other claimants in this litigation, they would need to introduce information placing those denials in context, thereby leading to a series of "mini-trials" where the Court had to pass judgment on the propriety of defendants' actions in each and every claim denial involving Dr. Handelsman or Ergoscience.  See, e.g., First Fid. Bancorporation v. Nat'l. Union Fire Ins. Co. of Pittsburgh, 1992 WL 55742, at *3 (E.D. Pa. Mar. 13, 1992) (noting defendant's "understandable desire to have a 'mini-trial' over each and every instance of bad

faith claimed by Fidelity" while prohibiting plaintiff from discovering documents concerning other bad faith actions against defendant); see also W.V. Realty, Inc. v. N. Ins. Co. of New York, 334 F.3d 306 (3d Cir. 2003) (dicta characterizing information relating to bad faith lawsuits other than plaintiff's as "irrelevant"); N. River Ins. Co. v. Greater New York Mut. Ins. Co., 872 F. Supp. 1411, 1412 (E.D. Pa. 1995).

Defendants also argue that production of the requested materials would be unduly burdensome.  Plaintiff counters that defendants already produced a spreadsheet containing claimant names, claim status, claim number, and third party vendor identification.  Using such a document, plaintiff argues, defendants could easily locate the Ergoscience materials she seeks. As to Dr. Handelsman, plaintiff points out that defendants have already produced several hundred of his reports, and defendants' ability to make such a production indicates that defendants could also produce the information plaintiff desires.

Defendants claim they were only able to produce Dr. Handelsman's reports because he happened to store them on a computer located at one of defendants' sites.  Other of Dr. Handelsman's materials, as well as the Ergoscience documents, would require defendants to gather and review third party materials maintained offsite.  Moreover, defendants assert, the material sought is of little or no relevance to this dispute, thereby tilting the balance between the difficulty in obtaining the information and its relative probity in favor of non-production.

Finally, Standard defends the validity of Ergoscience's functional capacity evaluation methodology in the context of vestibular disorders.  Although defendants admit that the Ergoscience methodology has not been specifically validated for use with vertigo, they stand by the appropriateness of its use here because the methodology has been effective in measuring

19

functional deficits related to the physical demands of employment, and been an accurate measure

of balance, stability, and fatigue – all symptoms of plaintiff's disability.  Defendants also

highlight the fact that Ergoscience's functional capacity evaluation was just one of many factors

they relied on in electing to terminate plaintiff's benefits, others including Dr. Handelsman's

evaluation, surveillance conducted on plaintiff, and plaintiff's completion of a Ph.D program.

That said, plaintiff has been able to connect some of the bad faith practices alleged to the

particular requests at issue.  Dr. Handelsman is not a vestibular disorder specialist, and

presumably Standard could have provided a physician with greater experience in evaluating

patients with plaintiff's condition.  Moreover, the use of Ergoscience's functional capacity testing

despite knowledge that Ergoscience's methodology did not have the appropriate approvals

suggests at least some possibility that further discovery might uncover evidence relevant to

plaintiff's claim.  Defendants' argument that it was relatively easy to produce Dr. Handelsman's

reports and comparatively more difficult to produce further materials is unpersuasive because it

seeks to join two unrelated concepts.  Whether one particular form of discovery is easier or

harder to produce than another has no bearing on whether such discovery should be produced.

Discovery is available where it is relevant to a claim or defense, and when its probity outweighs

its cost.  Here plaintiff has established some nexus between her allegations and the discovery

sought such that the probity of further third party vendor discovery outweighs its cost.  The Court

will therefore order the production of the materials plaintiff seeks, redacted to exclude

information concerning other insurance claimants, and produced consistent with the protective

order in place in this case.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LISA J. SANTER                              :
                                            :
                    Plaintiff        :      CIVIL ACTION
                                            :
        vs.                                 :
                                            :      NO.  06-CV-1863
TEACHERS INSURANCE AND               :
ANNUITY ASSOCIATION, ET AL.          :
                                            :
                    Defendants        :

## **ORDER**

AND NOW, this 18th day of March, 2008, it is hereby ORDERED:

1.      That plaintiff's Motion to Compel Production of Documents (Document No. 22)

is GRANTED IN PART and DENIED IN PART as set forth in the Court's Memorandum

Opinion;

2.      Defendants shall provide plaintiff with the materials ordered herein within 45 days

of the date of this Order; and

3.      The Court having granted additional discovery, plaintiff's motion for partial

summary judgment (Document No. 35), defendants' motion for summary judgment (Document

No. 47), and defendants' motion *in Limine* (Document No. 48) are DENIED with leave to renew

within 30 days of the close of discovery.

BY THE COURT:

/s/ Thomas M. Golden
THOMAS M. GOLDEN, J.